Good morning, Your Honors. May it please the Court, Melanie Parto for the Plaintiff Appellant Serge LaPointe. May I reserve four minutes of my time for rebuttal? Please say. I'd like to reserve four minutes of my time for rebuttal. Sure. Thank you. The two issues on appeal here are, first, the egregious withholding of information and identities of witnesses by the County Defendant, County of Los Angeles, and the erroneous dismissal, sua sponte, of the individual Deputy Defendants. And the second issue, of course, is the fact that there are material issues that disputed back on Plaintiff's Monell claims and that the District Court's dismissal of that claim was an error. Try to speak a little slower. Absolutely, Your Honor. I apologize. The first issue that I'd like to discuss is the withholding of information by the County of Los Angeles, the violation of Federal Rule of Civil Procedure, Rule 26F, and what resulted in the sua sponte dismissal of the individual Deputy Defendants by the District Court. First, on November 24, 2010, about seven months after the complaint in this case was filed, the defendants served Rule 26 initial disclosures, which the rules require them to have identified each witness by name, including contact information, who is likely to have discoverable information. Can I sort of interject and just see if I understand the posture of the case on this? My understanding is there was a complaint filed against the county and naming a variety of DOE deputies who allegedly were involved in this alleged excessive force incident. Correct. And you're arguing that you didn't get the information until very late in the game. That's correct. Isn't that correct? That's absolutely correct. And isn't it the District Court allowed you to file an amended complaint, naming the two DOEs now having names, Bui and Mersheng? Correct. Okay. And the District Court allowed you to file that. And then there was a motion filed, what, for summary judgment by the county? Correct. And the District Court, as I understand it, vacated the permission to file the amended complaint and then dismiss the complaint under Rule 4M as being untimely. The service hadn't been made on a timely basis. Almost. After the court granted leave to amend, the plaintiffs served the two individual deputies. The defendants filed a motion for summary judgment on behalf of the county only. And then in the court's order granting summary judgment as to the county, it stated in a footnote that all not served defendants were dismissed. We sought a request for clarification because the defendants had been served and wanted to know whether or not that meant, you know, just the DOEs or now Bui and Mersheng. The court then issued an order clarifying that Bui and Mersheng had been dismissed as well. We filed a motion for reconsideration, and the court vacated its prior order that had granted plaintiffs leave to amend to name them in the first place. So why isn't the error correctable under Rule 4M? Why do we have to get into the egregious withholding, except that that supports your claim for good cause? Exactly. Okay. So I think we have that. Okay. If there are no further questions from the bench with respect to the dismissal of the two defendants under 4M or 15, I'll be happy to move on to the monologues. Well, how did you find out, learn the identity of these two defendants? Well, about, let's see. That was your big problem, wasn't it? That was our huge problem, Your Honor. Sure. He said he got beat up in the prison, and he didn't know the names of these people. He said he was beat up. He knew that the individuals who beat him were two deputies who had escorted him from his cell to the mental health place or center in the Twin Towers facility. We received an initial disclosure document that said there were no documents regarding our plaintiff at all, almost as if he was never in custody. Then we received 20 pages of documents that didn't identify a single employee of the sheriff's department. It wasn't until June that we received several hundred pages of documents, including Mr. LaPointe's medical records and what have you, which identified nurses, doctors, deputies. So we started taking people's depositions who were named in the documents, and our client, Mr. LaPointe, accompanied us to those depositions, and he physically identified the two deputies sitting in the room as the two individuals who beat him. Shortly thereafter, within one week, we filed an ex parte application for leave to amend the complaint to name these two individuals as does, and those individuals were served within one week of the date that the court issued the summons for those two individuals. So you moved at all deliberate speed once you had the information, which had been withheld from you, and then you identified them, got them served. Correct. Okay. You weren't wasting any time. No, particularly in light of the fact that we knew there was a dispositive motion filing deadline coming up. We didn't want to disturb any of the trial deadlines. And, you know, in all honesty, we didn't believe that any of that really needed to change because both of those deputies' depositions had already been taken. All the discovery had already been done. All the documents had been produced. For all intents and purposes, they simply could have moved for summary judgment on behalf of the deputies and the county, and we would have had all of the evidence necessary to oppose and move forward as we wanted, but. And you take the depositions of Bouie and Murchane? We did. We also deposed several of the nurses who treated Mr. LaPointe while he was in the jail and the county's person most knowledgeable with respect to policies and procedures and prior incidents of use of force and that type of thing. I see. Okay. So if there are no further questions on this issue, I'll go ahead and move on to the Monell issue. So the district court in this case denied summary judgment as to Plaintiff's Monell claim because it found that there were no evidence to support either a policy pattern or practice or causation. The only piece of evidence that's cited in the district court's opinion is the fact that the plaintiff claimed that the deputy defendants told him that they hated French people. There's not a single reference to any of the evidence or the deposition testimony of four separate witnesses that were provided to the court in opposition to the motion for summary judgment. In particular, one of the nurses, Nurse Silva, testified, and this is the excerpt of record, page 188, that she didn't tell anyone about Mr. LaPointe's complaint to her that he had been beaten by deputies. She said at excerpt of record, page 190 to 191, that she's not trained to report injuries she observes on a patient if she believes that the injuries happened at the hands of deputies. At excerpt of record. Unless she sees them. Not unless she sees them. Unless she actually sees the deputy inflicting. Yes. She sees the deputies inflicting. That's kind of strange. She's a mental health nurse. That's correct. And normally they bring, deputies bring the inmate to the mental health nurse screener. Is that it? According to Nurse Silva's testimony at excerpt of record, page 189, deputies are always present and always escort an inmate to any medical care facility or for treatment in the Twin Towers facility. So the inmate essentially has two options. Either to... But if the consequence of that testimony, if that's the protocol, I think she called it, would mean that the only time that they would report it is if the deputies who are bringing the inmate for screening beat up the, or injure the inmate in that process? In front of them, I suppose. If there's, for example, an altercation or there's a... It could happen. Yeah. I mean, the deputies are there for a reason. Correct. Okay. Unfortunately, in this circumstance... What about Nurse Rubin's testimony? Nurse Rubin's testimony is consistent with Nurse Silva's testimony. I recognize in reading the appellee's brief that they try and misconstrue it somewhat Nurse Rubin says that she would report only to a doctor through the chain of command, but to a doctor any injuries that she sees being inflicted on a deputy, and that she would report only to a doctor and to no one else at page 205 of the excerpts of record. So Nurse Rubin's testimony is not and cannot be used to infer that she would, because she says chain of command, maybe report it to the deputies or to a sergeant or lieutenant or something. That's not what they're trained to do. Furthermore, we also deposed Lieutenant Bobo, who was the watch commander on staff while the plaintiff, Mr. LaPointe, was in custody. He testified... Before you rush along there, I want to make sure I get the right one. Silva is the one... Yeah. I'm looking at... I don't know. I'm looking at ER page 195. Your page sites may not be tracking the same as mine, but it's the... It's Nurse Silva. Nurse Silva, yes. Page 35 of the original transcript. Okay. Are we on the right page? I can grab that. Okay. This is after a lot of questioning about her policy or what she does, her practice, the one we discussed where she said that she would report to her supervisor if she saw the deputies inflicting injury in her presence. And then the questioning goes to who taught you that you don't have to report it under a situation like I gave you when you saw the injuries and the patient said the deputies caused it, but you didn't actually see it happen? That's what the questioner was driving at. Right. In other words, if you don't see it inflicted, but you do see the injury, and then the patient says, I got these injuries from these deputies, and her testimony was that she wouldn't do anything more than she would record... In the medical record. In the medical record. The answer that is provided, and then the excerpt quits, it says, right. You see that? No, Your Honor. Can you refer me to the page and line number? Yes. I'm looking at page 35, line 21 through 25. Who taught you that you don't have to report it under a situation like I gave you when you saw the injuries? Right. Well, I think that the testimony that she gave before then... Well, what about the question? What was the answer to the question? The answer to the question is the same answer that she's given during the remainder of her testimony. How do we know that? How do we know that? Well, I would be happy to provide a supplement to the excerpts of the court record. You would be happy, counsel, when you give it to us now. I appreciate that. Do you understand how frustrating it is to judges who have been lawyers and judges who try cases, and to get a partial transcript, and you're reading through carefully, and it doesn't give you the answer? I completely understand. And this may be a dispositive question. These excerpts of record are just for education purposes. The learning moment is this is what we rely on. We actually look at the record. So it's really useful to give us context. Okay? All right. Probably. We'll see if we need them. Was this the... What was your prior experience with federal courts? My personal prior experience with federal court? Yeah. I've been litigating cases in federal court for some time now, about six years. Six years? Yes. Okay. So let me understand. On the Monell issue, you're claiming there's a tribal issue? Yes, Your Honor. And give me the summary of all the points why you think there's a tribal issue. Well, we believe that the testimony of the four witnesses that were taken explains that there is a policy that if an inmate reports a use of force to medical staff and no one else, that the deputies know that they're not going to be disciplined or retrained or held in any way accountable. At the same time, we know that there's a policy that deputies themselves are the only individuals who have to self-report. Essentially, if they don't turn themselves in, then they're not going to be held accountable. Because of this practice and because this is the policy in training, and in conjunction with the fact that 50% of all uses of force against inmates go unreported by deputies, and we know that none of the uses of force that are within the knowledge of medical staff ever get reported to the deputies, there's a culture of impunity, which encourages deputies to use force against inmates excessively without justification and without any discipline or any accountability. Okay. Boy. You want to have a seat? And we'll hear from the... Are you with the County Counsel's Office? Your Honor, I am outside counsel, Lawrence B. Javins Choi. May it please the Court, Nathan Oyster on behalf of defendant Appelli County of Los Angeles. What I can do first is address the Minnell issue. I think as we've... It's quite a good idea. I will get right to that. I think what my colleague, Ms. Pateau, has pointed out is a theory that plaintiff has supporting Minnell claim, but the evidence does not support that.  I mean, she's given you a pretty good description of it. Well, here's what's interesting about this case, and I think this actually pertains to both issues. In virtually all civil rights litigation in which a plaintiff alleges a use of force, there's no dispute that a use of force actually occurred, that there was an incident involving a plaintiff and deputies. What's unique about this case is to this day, the position of the County of Los Angeles and the involved deputies is no one used force against this man. This gentleman, while he was an inmate, was mentally ill, and the position of the county is that no one used force against him. And I think that issue... That's a fact question, though. That is, but it helps give some context in terms of what's happening here. So just on the Minnell issue, at best, what plaintiff has submitted is evidence that nurses, when they observe inmate injuries, don't report them to the sheriff's department. You do have affirmative testimony that they report them to their supervisor through their chain of command. Even if we assume that... Well, one nurse, Reuben, says, if I see the injury and I'm told by the prisoner that the deputies inflicted it, I will report it to my supervisor. You have Silva directly contradicting that and saying, unless it takes place in my presence, I won't report it. I will record the injury, but I won't report it. It will just go into the file. What you'd even have, even if you accept that, you would still have documentation of an inmate injury. Well, now, wait a minute, counsel. Inmates, there's a policy against excessive force in the jails. Absolutely correct. And we all know, I mean, you can't ignore the headlines about the investigation involving the jails, but in any event, just the logic of it. County has an admirable policy of saying no excessive force in the jails. The jails are dangerous places. There's lots of opportunity for injury to happen in legitimate discipline. There is a policy to report, self-report, use of force, which is not necessarily excessive force. You have a medical staff in-house. A prisoner goes to the medical staff with an injury, and you have a nurse saying, well, I see the injury, and the inmate tells me that it's been inflicted by a deputy, but not in my presence. And the protocol is, unless you see it happen, all you do is you make a note, injury, patient says, I was beaten up, and it goes into the file. That is not a kind of regime that provides for very much accountability on its face. And if the deputies know that, why isn't that complicit in a practice that allows excessive force to occur and go undetected? Well, I think there's two points to that, Your Honor. I think, first of all, even if you accepted the testimony of the one nurse and heard that interpretation, that would be, at best, a lack of training and understanding by one employee. No, that's why I wanted the answer to the question that I asked counsel for. Who taught you to not report? That's a protocol, and if that's the protocol that they are trained to do, affirmatively not to report up the chain unless they actually see it happen in front of them, that would be a practice that one could infer is deliberate indifference to excessive force, because you have a policy, but your implementation of the policy is designed to suppress relevant information. Let's suppose, for example, that a woman comes in, a woman patient comes in, and she's reporting mental nightmares and, you know, all of that, and she reports that there's no physical injury showing on her. She reports to the mental health nurse and says, I've been raped every Friday since I've been in this jail by this guard, and it's driving me crazy. If you take Nurse Silva's response, she would record that the patient has a mental injury, if you will, and she would put in the file and report to no one else that the patient has told her that she's been raped repeatedly by a guard in the jails. Would that be a policy or just a failure to train? Well, if the county of Los Angeles has an affirmative policy to the contrary, yet one employee fails to understand that policy, then I don't believe the ---- Well, that's an evidentiary matter, you know. Well, the point of the one person, though, I think goes to Blankenhorn versus City of Orange on a failure to train policy, where the Ninth Circuit has previously addressed the issue of what happens if a municipality or public entity has failed to train one person. Don't misunderstand the thrust of my question. If there is an affirmative policy not to report, that's not a failure to train. It's a policy and a practice that encourages or facilitates abusive behavior within the jails. Now, I'm not saying that that's proved, but that's what they are trying to prove. And I understand the Court's position, and I do understand the distinction between a policy of suppressing complaints versus a policy that requires reporting and one employee failing to understand it. I think on the record before this Court, there is no evidence of a policy suppressing complaints made by inmates. In fact, the affirmative evidence that the county submitted in support of the motion for summary judgment details the procedures that go into investigating complaints by inmates regarding use of force. What is that evidence? That would be the declaration of Christine Shalinga that was submitted in support of defendants' motion for summary judgment. Okay. That's who? What did she say on the issue that we've just been talking about? That specific issue is not addressed, but the general prohibition on the use of force and the processes that go into investigating complaints that are made by inmates. But what do they say about reporting by medical staff? What does she say about reporting by medical staff to address the hypothetical I gave you? That specific issue is not addressed, Your Honor. That's right. Well, now, let's say a person goes to an emergency hospital and waits and then gets admitted to see a doctor. And, of course, is probably interviewed before the information is taken. And that person has some visible manifestation of being beaten up. And the person tells the doctor or whoever there is at the hospital, the administrator, that they've been beaten up by law enforcement officers and says it's the LAPD. Now, isn't that person obligated under the law to report that statement, that I have someone here who has some visible injuries who states that they were inflicted by two police officers? Now, that person is required to report that information to the law enforcement, to the LAPD, to call up headquarters. That's required, isn't it? And I believe that's done on a widespread basis throughout Southern California. Oh, I think it is, too. But it isn't done in the jail, according to what she said, this one witness. If the court has no further questions on the Monell issue specifically, I'd like to address the other issue concerning the two individual deputies. I have a question on the two individual deputies. It's clear, well, the record suggests strongly that the names of these two folks were withheld. And when they were identified, they were promptly requested to be added as name defendants, and they were served, and a discovery took place. And then for the district court to basically vacate all of that and not let a trial on the merits occurrence of two individuals seems unjust to me. How do you respond to that? Well, I think in terms of let's talk about the global justice issue, there is a pending matter in the Los Angeles Superior Court currently against the two individual deputies. That matter is pending. So after the district court declined to exercise supplemental jurisdiction over the state law claims, Mr. LaPointe refiled those claims in Superior Court. So he is currently pursuing claims against the two deputies there. What's that got to do with anything? Well, just in terms of a justice in determining whether or not he has a remedy. How about compliance with Rule 4M? Well, I think the district court's reference to Rule 4M, I do believe, is erroneous. I believe the correct analysis that does support the dismissal or, pardon, refusing leave to amend to name the deputies would be under Rule 16 and the good cause standard. Well, when were they furnished, the names of the deputies? Well, these deputies' names are listed in medical records that were produced in June of 2010. Was that within 120 days of filing the complaint? It was not. Yeah, right. The district... Swimming uphill. I think where this basically comes down to is when you have a scenario where everyone on both sides of litigation knew up front that the defense position was nothing took place, the plaintiff is going to have an affirmative duty to try to identify who those DOE defendants are. And in this particular case, we have an April 2010 filing of a complaint. Then we have a series of deadlines that the district court set regarding the last day to add parties. But the county knew who they were. Your Honor, that's not correct. Well, you just said their names were in records. They were in records in June, along with numerous other county employees. The county's position to this day is these two individuals did not do anything to Mr. LaPointe. That's a fact issue. I presided over numerous excessive force trials, and I let them go to trial because you don't know what's right or wrong without a trial on the merits. So to say that the two individuals' names were present along with others doesn't answer the question. It took the plaintiff a while to identify these folks, and once they did, I'm troubled personally by what the district court did to eliminate an opportunity for there to be a trial against these two individuals in federal court as opposed to state court. And if I may, with the records, these records, they're going to have the identity of 40, 50. Counsel, let's just step back a minute. You say, well, the district court's citation to Rule 4M was in error. It should be under Rule 16. Where's the discussion of any of what you're talking about in the district court? Well, I think in the fourth opinion, there's four relevant opinions that the district court had. The September 8th opinion that allowed the Doe amendments, and the final one is the October 25th order. And the court, at the conclusion of it, says, suffice it to say the prior order was clearly erroneous and would work a manifest injustice. Now, although the district court doesn't reference Rule 16, that's consistent with a good cause evaluation under Rule 16. Come on. Okay. So you're up here making it up. No, Your Honor. I do think the district judges have an obligation to let us know the basis for what they're doing. Citing the Rule 4M, okay. And I think Rule 4M makes it darn clear that there's a good cause exception that's intended to be exercised. That's what it says in the commentary, right? Yes. So you're up here saying, well, it's really Rule 16, and we'll infer it from his fourth order. Were you part of what took place in the district court? I was, Your Honor. Did you ever point out to the judge, Your Honor, you're making a mistake? Well, it's interesting because all of these orders were issued without any hearings, so there were no chance for any of the parties to work together to try to resolve any of these issues. So it's not your fault? I don't want to say. We won't tell anyone. If I'm to blame, I'm to blame. I don't want to pass responsibility, but I do believe I'm out of time. That's all right. We'd like to have you there. If the court has any other questions for me, I'd be happy to address them. Thank you. Thank you. Thank you very much. So why wasn't that last, the continuation page included in your excerpts? I have a feeling that it's because of the testimony that appears earlier in that transcript on pages 34 and 35. And I'm looking at the transcript page, not the excerpts of record page. But on page 34, starting at line 4, the question's asked, if the patient, if you see injuries on the patient, then the patient tells you the deputies caused the injuries, then based on your training, you did not report it. Is that correct? Answer, yes. Okay. Where do you get your training from? Who trains you in that regard? The County of Los Angeles has a training department for that? Yes. And then on page 35, the question's asked, okay, so where did you learn from that? You should report it when you actually see it happen. Someone at the jail taught you that? From, I guess, from the nursing staff, nursing procedure. At the jail? Yes. I concede that the next page, page 36, should have been included. And, again, I would be more than happy to supplement the record if the court would like. Well, I think you should because there's an inference that you didn't like the answers. Absolutely. I have two other points that I'd like to make on rebuttal. First is the records that were produced and the number of witnesses who were there and all of that type of who could have been named and that type of thing. I would just like to point out, and my office has litigated many cases against and with Mr. Oyster's office, and we have a great deal of respect for each other, and I know, again, that this isn't him. But along with those records that were produced in June, there's a declaration signed by the sheriff's department's custodian of records, and that's dated February 7th, meaning that the sheriff's department, his client, had these records for months, four, five months before they produced them to us. Had they produced them to us when the custodian of records signed off on them in February, we would have, in fact, had enough time to amend the complaint and name the deputies before the 120 days or whatever had expired. The last point that I'd like to make on rebuttal is with respect to the appellee's claim that there's no evidence that inmate complaints are suppressed based on the evidence that we have in the record. But our position is that the practical effect of a policy that says that if an inmate complains to medical staff that that complaint isn't going to see the light of day is the very thing, the very same thing as suppressing inmate complaints, because they're never investigated, they're never followed up on, and frankly, they're never reported. If there are no further questions from the bench, so be it. Thank you. Thank you. Thank you both. Thank you both. And we do appreciate the civility between counsel.
judges: Daniel, Pregerson, Fisher